IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KIMBERLY SUE WRIGHT,

               Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

               Defendant.

Case No. 3:15-cv-01356-AA
OPINION AND ORDER

———————

Nancy J. Meserow
Law Office of Nancy J. Meserow
7540 SW 51st Avenue
Portland, OR 972219
        Attorney for plaintiff

Janice E. Hébert
Assistant United States Attorney
United States Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97201

Heather L. Griffith
Special Assistant United States Attorney
Office of General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104
        Attorneys for defendant

Page 1 - OPINION AND ORDER

AIKEN, Judge:

Plaintiff Kimberly Sue Wright brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied plaintiff's application for Title II disability insurance benefits. For the reasons set forth below, the Commissioner's decision is reversed and this case is remanded for further proceedings and a partial award of benefits.

## BACKGROUND

Born October 25, 1961, plaintiff was 40 years old when she alleges she became disabled and 52 years old on the date of her disability hearing. Tr. 191. She completed the tenth grade and earned her GED. Tr. 59. Her most significant work history is as a licensed correctional officer, a job she performed full-time for four years in the early 1990s. Tr. 204, 211. She also has worked as a hair stylist, care provider, fast food cashier, motel clerk, and gas station attendant. Tr. 204, 211.

In her application for benefits, plaintiff alleged she suffers from bipolar disorder, post traumatic stress disorder, and attention deficit hyperactivity disorder. Tr. 203. Plaintiff asserts her struggles with mental health began after her children were born. She reports being depressed after the birth of each of the first three children, and believes the birth of her fourth child triggered her first manic episode with psychotic features. Tr. 296. Both plaintiff and her husband attribute her losing her job as a corrections officer to her mental health problems. Tr. 7, 77. Plaintiff began attempting to treat her depression and mania with medication in about 1994, and she was diagnosed with bipolar disorder after her first inpatient hospitalization, in 1996 or 1997. Tr. 65.

In the early 2000s, plaintiff had a series of hospitalizations and run-ins with law enforcement. July 10, 2000, she was extremely combative when she was taken to the hospital after a car accident. Tr. 314. She screamed obscenities, spit in the face of hospital staff, refused most treatment, and left against medical orders; shortly thereafter, Coos County Sheriff's Deputies arrested her in the hospital lobby. Tr. 304. A week later, on July 17, 2000, plaintiff was admitted to the same hospital after

ambulance personnel found her "combative and out of control" at her home.[1]  Tr. 302.  Medical records from her admission list her chief complaint as "[s]creaming and out of control."  Tr. 304. Dr. Charles Reagan evaluated plaintiff and concluded the incident stemmed from her bipolar disorder and alcohol abuse.  Tr. 302-03.  Dr. Reagan wanted plaintiff to stay in the hospital longer to track her response to a new medication, but plaintiff "demanded" to leave on July 19, 2000.  Tr. 302. Three days later, on July 22, 2000, Coos County Sheriff's Deputies brought plaintiff back to the hospital.  Tr. 294.  Plaintiff told the admitting physician she "just could not take her medicines" and she "didn't feel safe at all."  Tr. 294.  Plaintiff described a 48-hour period of "racing thoughts" and "impulsive behavior" following a period of "decreased energy" and "worthlessness."  Tr. 292.  She was admitted "for what appeared to be a manic episode" and stayed in the hospital for nine days. Tr. 292.

In 2001, plaintiff underwent a hysterectomy to address "severe dysmenorrhea,"[2] which her doctors suspected was exacerbating her manic symptoms.  Tr. 278.  June 12, 2003, plaintiff was admitted to the hospital during another manic episode.  Tr. 267-69.  She reported she had been off her medications for two to three weeks after she temporarily separated from her husband and left her medications at their shared home.  Tr. 267.  After plaintiff had a "confrontation" with a "very threatening" male patient, she requested discharge because "she felt uneasy with [that] patient on the unit."  Tr. 265.  The discharging doctor's notes state plaintiff's improvement was "very rapid" but characterize it as "unfortunate" that she left after only two days.  Tr. 265.

In January 2006, plaintiff attempted "suicide by cop" when she brandished a toy pistol at police officers.  Tr. 66, 386.  She was shot in the thigh.  Tr. 383.  She spent twelve days in the hospital undergoing psychiatric treatment and wound care.  *See* Tr. 321-57.  Her admission was

---

[1] It is unclear why an ambulance was called to plaintiff's house; the note from the admitting physician states plaintiff "could provide no useful history since she was very combative and out of control."  Tr. 304.

[2] "Dysmennorhea is the medical term for pain with menstruation."  Cleveland Clinic, Diseases & Conditions:  Dysmenorrhea, myclevelandclinic.org/health/diseases_conditions/hic_Dysmenorrhea (last visited Jun. 30, 2016).

voluntary, but the admitting physician noted if she had attempted to leave, he would have placed her on a hold. Tr. 334. She also was incarcerated for ninety days. Tr. 8, 73. Plaintiff characterized this period in the early and mid-2000s as the "worst dark, dark years." Tr. 65. Her husband, Roy Wright ("Roy"), submitted a letter to the Appeals Council describing "a long, long period where there would be spray painting on the walls, sorting through every piece of paper in the house, drinking and yes, drugs, as she slowly went completely off the rails." Tr. 7.

Since 2006, the record contains no evidence of hospitalization or problems with law enforcement. Plaintiff has been treated by Dr. Reagan on a somewhat regular basis since 1999.[3] *See* Tr. 406-23 (documenting seventeen visits between June 2003 and June 2008); 395-404 (documenting twelve visits between April 2009 and April 2012), 435-48 (documenting ten visits between May 2012 and July 2013). At times, plaintiff saw Dr. Reagan as frequently as once every few weeks, but there are also stretches of up to a year without any recorded visits. The longest of these stretches aligns with a year plaintiff spent in Thailand, volunteering as an English teacher. Tr. 69, 74-75, 398-99. At the hearing, plaintiff testified that she had a good experience in Thailand because she lived with a group of volunteers, "almost [all of whom were] also suffering from some sort of depression or something." Tr. 68. When she was "having an episode," others would cover for her. Tr. 74-75. She estimated she missed two to three days of work every couple of weeks due to bipolar disorder. Tr. 75. She also stated that because she was a volunteer, she could "kind of get away with" not being "a hundred percent." Tr. 75.

Plaintiff's medical records consistently document problems with her marriage. *See, e.g.,* Tr. 302 (during first July 2000 hospitalization, plaintiff reporting her husband "has begun to harass her and suggest divorce"); Tr. 296 (during second July 2000 hospitalization, documenting plaintiff's

---

[3] The ALJ found plaintiff's treatment relationship with Dr. Reagan began in 2003, which is consistent with plaintiff's testimony. *Compare* Tr. 20 *with* Tr. 70. However, the medical records from plaintiff's hospitalizations show that outpatient treatment was already ongoing by 2000. *See* Tr. 302 (medical record dated July 19, 2000, noting that plaintiff was followed by Dr. Reagan on an outpatient basis for bipolar disorder). Roy stated Dr. Reagan first began treating plaintiff in 1999, following two hospitalizations in the "mental ward of Coos Bay Hospital." Tr. 8.

allegations of serious emotional abuse of serious emotional abuse); Tr. 265 (during 2003 hospitalization, noting "problems in a partner relationship, with her marriage of six years"); Tr. 333 (during 2006 hospitalization, noting a "[l]ong history of domestic discord and possibly violence but no well documented violence"); Tr. 401 (in 2009, plaintiff stating she is doing "pretty good" and that "Roy is the only problem in her life now"). Plaintiff testified she considers herself more than fifty percent responsible for her marital problems, because "it is probably impossible to live with someone who has bipolar or some kind of a mental problem like this because this person — like I'm all over the place." Tr. 79.

The record reflects a number of changes in type and dosage of medication over the years. *See, e.g.*, Tr. 8, 298, 302, 396. Plaintiff testified that for years,

> [T]hey were trying to find the right combination of medications. I pretty much tried them all, and so those were all years of medications that failed or didn't do what they thought and hoped that they would do, and then trying something else and having that have the side effects.

Tr. 66. She also stated she fell into the "very common pattern" of going on and off her medications. Tr. 66. After the 2006 shooting, plaintiff and Dr. Reagan "pretty much found the meds that will work." Tr. 70. Plaintiff testified that because of the shooting, she "learned a lot" about the consequences of failing to take her medication. At the hearing, plaintiff reported being on Topamax, Lamictal, and Seroquel. Tr. 72. She also takes NephrAmine (essential amino acids), medication for recently diagnosed type two diabetes, and thyroid medication. Tr. 72.

In September 2013, Dr. Reagan completed a questionnaire prepared by plaintiff's lawyer. The questionnaire specifically asks about plaintiff's functional limitations on or before June 30, 2004, which is plaintiff's date last insured. Tr. 449. In the questionnaire, Dr. Reagan opined plaintiff would miss more than two days of work per month due to her conditions; would be unable to consistently work an eight hour day five days per week; and would have significant problems with concentration and irritability. Tr. 449-50; *see also* Tr. 57.

In a June 2012 disability report, plaintiff stated her "illness . . . has severely affected [her] quality of life and [her] independence." Tr. 230. She alleged when she is having a manic episode,

she has to take medication to slow her mind down, resulting in at least three to seven days and up to two weeks of bed rest. Tr. 230. When she is depressed, she is unable to function, is sometimes suicidal, and is a danger to herself and others; at these times, she is unable to cook, clean, or even maintain proper personal hygiene. Tr. 230. In his letter to the Appeals Council dated April 3, 2014, Roy stated plaintiff "doesn't bathe often, has conflict with family members and others, . . . and often withdraws to be by herself." Tr. 9.

Plaintiff alleges disability beginning December 31, 2001. Her application was denied initially and upon reconsideration. Tr. 98, 106. In November 2013, plaintiff was represented by counsel at a hearing before an administrative law judge ("ALJ"). Tr. 52. After the ALJ issued an unfavorable decision, Tr. 23, the Appeals Council denied review, Tr. 1, rendering the ALJ's decision the final decision of the Commissioner. Plaintiff then filed this appeal.

## THE ALJ'S FINDINGS

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1502(a)(4). At step one, the ALJ found plaintiff had not engaged in "substantial gainful activity" between the alleged disability onset date (December 31, 2001) and the date last insured (June 30, 2004). Tr. 17; *Yuckert*, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(a)(4)(i), (b). At step two, the ALJ found plaintiff suffers from a single medically severe impairment: bipolar disorder. Tr. 17; *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). At step three, the ALJ determined plaintiff's impairment did not meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Tr. 17-18; *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

The ALJ determined plaintiff had the Residual Functional Capacity ("RFC") to perform the full range of work at all exertional levels, subject to a set of nonexertional limitations: no more than occasional superficial interaction with the public; only superficial interaction with coworkers; only unskilled work due to concentration problems; and work that is low-stress, is not fast- or production-

paced, and does not involve persuasive communication. Tr. 19; 20 C.F.R. § 404.1520(e). At step four, the ALJ concluded plaintiff could not perform her past work as a corrections officer, care provider, hair stylist, or fast food cashier, because those jobs all required social interactions beyond the limits set in the RFC. Tr. 21; *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(a)(4)(iv), (f). At step five, the ALJ relied on the testimony of a vocational expert ("VE") to find plaintiff could work as a cleaner of manufactured homes, bundle clerk, or stock helper. Tr. 22; *Yuckert*, 482 U.S. at 142; 20 C.F.R. §§ 404.1520(a)(4)(v), (g). Accordingly, the ALJ found plaintiff not disabled and denied her application for benefits. Tr. 23; 20 C.F.R. § 404.1566(c).

## STANDARD OF REVIEW

A district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). The Commissioner concedes the ALJ's decision in this case is not supported by substantial evidence. Def.'s Br. 1-2 (doc. 21). The only issue is whether the decision should be remanded for further proceedings or for an immediate award of benefits.

District courts have discretion to decide whether to remand for further proceedings or for an award of benefits. 42 U.S.C. § 405(g); *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001). The issue turns on the utility of further proceedings. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099-1100 (9th Cir. 2014). Remand for an award of benefits is appropriate when "no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed. *Id.* (quoting *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012).

In the Ninth Circuit, courts determine which sort of remand is warranted by applying the "credit-as-true doctrine." *Garrison v. Colvin*, 759 F.3d 995, 999 (9th Cir. 2014); *see also Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011) (holding district courts may not award benefits punitively and must conduct a credit-as-true analysis whenever the Commissioner's decision will be reversed). The "credit-as-true" doctrine is "settled" and binding on this Court. *Garrison*, 759 F.3d at 999. The Ninth Circuit articulates the rule as follows:

The district court must first determine that the ALJ made a legal error, such as failing to provide legally sufficient reasons for rejecting evidence. If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual issues have been resolved. In conducting this review, the district court must consider whether there are inconsistencies between the claimant's testimony and the medical evidence in the record, or whether the government has pointed to evidence in the record that the ALJ overlooked and explained how that evidence casts into serious doubt the claimant's claim to be disabled. Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits.

If the district court does determine that the record has been fully developed and there are no outstanding issues left to be resolved, the district court must next consider whether the ALJ would be required to find the claimant disabled on remand if the improperly discredited evidence were credited as true. Said otherwise, the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true. If so, the district court may exercise its discretion to remand the case for an award of benefits. A district court is generally not required to exercise such discretion, however. District courts retain flexibility in determining the appropriate remedy and a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony.

*Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (internal citations and quotation marks omitted).

## DISCUSSION

Because the Commissioner concedes legal error, the first step here is to review the record as a whole to determine whether it is fully developed such that there is no "serious doubt" that plaintiff is disabled. *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014). If the record has been fully developed, I must proceed to determine whether a finding of disability would be required on remand. *Dominguez*, 808 F.3d at 407. I conclude plaintiff is entitled to an immediate award of benefits for the period between December 31, 2001 and January 28, 2006, but further proceedings are necessary to determine whether and for how long plaintiff remained disabled after January 2006.

*I.     Period Before January 28, 2006*

The evidence in the record relevant to determining disability between December 31, 2001, and January 28, 2006, includes plaintiff's testimony; Roy's letter to the Appeals Council; medical

records, both from Dr. Reagan and from other physicians, related to plaintiff's four hospitalizations between 2000 and 2006; Dr. Reagan's outpatient treatment records from 2003 to 2006;[4] and the questionnaire completed by Dr. Reagan. Roy's statement summarizes this evidence well, noting that plaintiff's bipolar disorder "led to the loss of her job, her position in the church, led her to be shot, sent her to jail on multiple occasions, forced her to leave the community and tagged her with a criminal record." Tr. 9. Dr. Reagan and other physicians assessed Global Assessment of Functioning ("GAF") Scale scores of between 38 and 60 during this time period, with the majority of assessments at 50 or below, reflecting significant impairment in psychological, social, and occupational functioning.[5]

Crisis points (job loss, family strife, hospitalization, arrest, etc.) in the record punctuate stretches of relative calm. This tracks the familiar pattern of bipolar disorder, which this Court recently acknowledged is "inherently cyclical":

> Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. The regulations themselves provide [that] proper evaluation of . . . impairments must take into account any variations in the level of your functioning in arriving at a determination of severity over time. . . . When a person who suffers from severe panic attacks, anxiety, and depression improves, that does not mean that the person's impairments no longer seriously affect her ability to function in a workplace. Occasional symptom-free periods — and even the sporadic ability to work — are not inconsistent with disability.

*Sunwall v. Colvin*, — F. Supp. 3d —, 2016 WL 259703, *3 (D. Or. Jan. 21, 2016) (citations and quotation marks omitted, punctuation and alterations normalized). The ALJ noted the connection between the crises and other issues — plaintiff's alcohol and drug abuse, martial problems, and

---

[4] The record contains no outpatient treatment records from before 2003.

[5] A GAF score between 31 and 40 reflects "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision 34 (2000) ("DSM-IV"). A GAF score between 41 and 50 reflects "serious symptoms" such as "suicidal ideation" or "any serious impairment in social, occupational, or school functioning." *Id.* A GAF score between 51 and 60 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.*

"going off" her medications. Far from suggesting the symptoms caused by plaintiff's bipolar disorder were not that serious, these issues all appear to have been either caused or greatly exacerbated by plaintiff's underlying mental health issue. Viewing the record as a whole, it is clear the driving force behind plaintiff's problems is bipolar disorder.

Having found that the record is fully developed as to the period up to January 28, 2006, I now must determine whether the ALJ would be required to find plaintiff disabled on remand if the improperly discredited evidence were credited as true. I conclude the answer to this question is yes.

Dr. Reagan opined plaintiff would miss more than two days per month due to her condition, could not work a full-time schedule consistently, and would struggle to concentrate or complete simple tasks. Tr. 450. This opinion is expressly limited to the period before plaintiff's date last insured. Tr. 449. I find Dr. Reagan's opinion about plaintiff's limitations consistent with his contemporaneous treatment notes and give it great deference based on his long relationship with plaintiff. At the hearing, the VE confirmed that missing two or more days per week or being off-task more than ten percent of the time would preclude competitive employment. Tr. 88. Crediting Dr. Reagan's opinion as true, therefore, the ALJ would be compelled to find plaintiff disabled through June 30, 2004.

Moreover, I infer from the record as a whole that plaintiff's disability continued until at least January 28, 2006, when she was discharged from the hospital following her suicide attempt. Although there are limited medical records between plaintiff's date last insured and the shooting, medical records from plaintiff's hospitalization in 2006 show her symptoms from bipolar disorder continued to be disabling. The admitting physician documented substantial symptoms of mania and depression, "dirt caked under her nails," strange dress, skin covered in flea bites, and continuing marital strife. Tr. 334-35. On remand, plaintiff is entitled to an immediate award of benefits for the period between December 31, 2001 and January 28, 2006.

II.    *Period After January 28, 2006*

Further proceedings are warranted, however, with respect to the period after the suicide

attempt and subsequent hospitalization. The regulations contemplate awards of benefits for a closed period of disability. *See* 20 C.F.R. § 404.1520(c) ("[I]t is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment."); *id.* § 404.1594 (describing "[h]ow we will determine whether your disability continues or ends" including whether there has been medical improvement relevant to ability to work). Here, further proceedings are necessary because gaps and conflicts in the record leave serious doubt as to whether and how long plaintiff remained disabled after January 28, 2006.

First, Dr. Reagan's opinion regarding plaintiff's limitations is expressly limited to the period before June 30, 2004. Tr. 449. Accordingly, it is not an assessment of plaintiff's limitations after that date. Second, plaintiff made at least two statement suggesting the suicide attempt was a turning point in the success of her treatment. *See* Tr. 70 (stating that after 2006 shooting, Dr. Reagan "pretty much found the meds that will work" to manage the bipolar disorder); Tr. 65 (characterizing the time leading up to her suicide attempt as the "worst dark, dark years"). Third, Dr. Reagan's treatment records document improvement beginning in 2006. As noted above, between 2001 and 2004, treatment records generally assessed a GAF of 50 or below, and never provided a GAF higher than 60. By contrast, treatment records between 2006 and 2013 only twice included a GAF below 60, and frequently listed a GAF of 70.[6] The post-2006 records also frequently state plaintiff is doing "well" with "mild" problems; though there are documented episodes of "fast thoughts" and depression, there is no reference to severe problems rising to the level of the incidents documented in 2000, 2003, and 2006. *See* Tr. 396, 399, 401, 402. Finally, plaintiff's two long-term trips to Thailand to work as a volunteer provide further evidence of improvement. On remand, the ALJ must reconcile these records with plaintiff's statements, Roy's letter, and other evidence regarding the continuing limiting effect of her bipolar disorder.

---

[6] A GAF of between 61 and 70 reflects "some mild symptoms . . . but generally functioning pretty well." DSM-IV at 34.

**CONCLUSION**

The Commissioner's decision is REVERSED and REMANDED for further proceedings and a partial award of benefits. On remand, the ALJ must (1) find plaintiff disabled for at least the period of December 31, 2001 to January 28, 2006, and award benefits for that period; and (2) assess whether and for how long plaintiff's disability persisted after January 28, 2006.

IT IS SO ORDERED.

Dated this 6th day of July 2016.

_____
Ann Aiken
United States District Judge

Page 12 - OPINION AND ORDER